<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| S.K., *et al.*,<br><br>           Plaintiffs,<br><br>     v.<br><br>BERNARDS   TOWNSHIP   BOARD   OF<br>EDUCATION,<br><br>           Defendant. | Civil Action No. 23-01279 (GC) (JBD)<br><br>**OPINION** |

<u>**CASTNER, District Judge**</u>

This matter comes before the Court upon competing motions for summary judgment filed by Plaintiffs S.K. and S.K., individually and as guardians *ad litem* of S.K., and Defendant Bernards Township Board of Education (the "District"). (ECF Nos. 12, 13.) Both sides opposed and neither replied. (ECF Nos. 14, 15.) The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Plaintiffs' motion is **DENIED**, and the District's motion is **GRANTED**.

## I.     **BACKGROUND**

### A.     **Individuals with Disabilities Education Act (IDEA)**

Through the IDEA, the federal government provides funding to assist states with educating disabled children living within their borders. *See* 20 U.S.C. §§ 1400 *et seq.*; *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267 (3d Cir. 2014). To receive these funds, states must adopt policies and procedures meant to ensure that all children with disabilities receive a free

appropriate public education (FAPE).  20 U.S.C. §§ 1412(a), 1413(a); *see also Blunt*, 767 F.3d at 267-68.  In providing a FAPE, a state must provide an individualized education program (IEP) that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *J.M. v. Summit City Bd. of Educ.*, Civ. No. 19-00159, 2020 WL 6281719, at *1 (D.N.J. Oct. 27, 2020), *aff'd*, 39 F.4th 126 (3d Cir. 2022) (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403 (2017)).  "If parents are dissatisfied with the district's determinations or IEP, they may bring a challenge in a state administrative process and then seek review in court."  *Id.*

### B.    Factual Background

The following facts are undisputed.[1]  S.K., a seventeen-year-old student, is diagnosed with Autism Spectrum Disorder and a Mixed Language-Based Learning Disability that impacts reading, expressive, receptive, and written language.  (ECF No. 12-2 ¶ 1.)  S.K.'s family moved to the District from California in the spring of 2019 during his seventh-grade year.  S.K. had an IEP from California that provided educational services to S.K. in a small-group setting and included related services for speech-language therapy.  In California, S.K.'s school district administered cognitive-functioning evaluations and [Plaintiffs] obtained private evaluations.  All of the evaluation test results indicated that S.K.'s IQ was in the 70s range.  He was classified as eligible for special education based on the diagnosis of autism.  His placement in California was similar to a language/learning disabilities (LLD) placement in New Jersey, with speech services and a behavioral consultant.

---

[1]    The Court recites undisputed facts largely as Administrative Law Judge Lieberman presented them in her final decision.  (*See generally* ALJ Op. 3-4, ECF No. 16-19.)

S.K. started as a seventh-grade middle school student with the District in March 2019.  He began eighth grade in September 2019.  School closed due to the COVID-19 pandemic in March 2020.  S.K. received remote instruction through the end of his eighth-grade year.  Remote instruction continued in September 2020, when he entered high school as a ninth grader.  Starting in October 2020, S.K. attended high school in person on a part-time basis.  The high school resumed full-time in-person classes on or about February 2021.

The District prepared IEPs dated April 26, 2019, November 15, 2019, April 27, 2020, and March 30, 2021.  (J-1; J-3; J-5; J-8.[2])

Plaintiffs retained Edna Barenbaum, Ph.D., and Carly Fog to evaluate S.K.  At the time of the evaluations, S.K. was completing the ninth grade at Ridge High School.  On July 11, 2021, Plaintiffs provided the District with Dr. Barenbaum's evaluation report and requested that the District agree to explore schools outside the District for S.K. and pay for all costs associated with such a placement.  (J-11.)  On August 9, Plaintiffs provided the District with Fog's evaluation and restated their request for exploration of an out-of-district placement and payment by the District.  (J-12.)  On August 23, Plaintiffs advised the District that they selected the Center School as an appropriate placement for S.K. and requested that the District place him there effective September 8, 2021.  They advised that if the District refused, they would place him there unilaterally.  (J-13.)

On August 25, Plaintiffs filed their due-process petition.  On September 8, the District acknowledged receipt of the August 23 letter and declined to effectuate S.K.'s placement at the Center School.  (J-14.)

---

[2]     Exhibits beginning with "J" refer to joint exhibits presented at the hearing.  (*See* ECF Nos. 16-2, 16-3.)  Exhibits beginning with "P" refer to exhibits presented by Plaintiff S.K. at the hearing.  (*See* ECF No. 16-4, 16-5, 16-6.)   References to exhibits beginning with "R" refer to exhibits presented by the District at the hearing.  (*See* ECF Nos. 16-7, 16-8, 16-9.)

C.      **Administrative Process**

1.      Due Process Petition & Hearing

On August 25, 2021, Plaintiffs filed a due-process petition seeking the following judicial intervention:

- a finding that the District deprived S.K. of a free appropriate public education for at least two years;

- a determination that S.K. requires a program than can address his learning needs throughout the school day;

- a determination that the Center School, or a similar program, can provide S.K. a program in accordance with Plaintiffs' expert recommendations;

- an order directing the District to develop S.K. at the Center School at no cost to Plaintiffs for the 2021-2022 school year and continuing so long as the school remains appropriate; and

- any other relief that the court deems appropriate and just.

[(J-22, ECF No. 16-3 at 236;[3] ALJ Op. 2.)]

The matter was transmitted by the Department of Education, Office of Special Education (OSE), to the Office of Administrative Law (OAL), where it was filed on October 5, as a contested case.  The ALJ held a seven-day hearing on the following dates: March 23, March 29, April 6, June 3, August 4, October 17, and December 1, 2022.[4]  (ALJ Op. 2.)

The ALJ ruled in the District's favor after hearing testimony from nine witnesses.[5]

---

[3]      Page numbers for docket-entry cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[4]      The March 23, 2022 Transcript ("1Tr.") is at ECF No. 16-11; the March 29, 2022 Transcript ("2Tr.") is at ECF No. 16-10; the April 6, 2022 Transcript ("3Tr.") is at ECF No. 16-12; the June 3, 2022 Transcript ("4Tr.") is at ECF No. 16-14; the August 4, 2022 Transcript ("5Tr.") is at ECF No. 16-13; and the October 17, 2022 Transcript ("6Tr.") is at ECF No. 16-15.

[5]      For detailed summaries of the witnesses' testimony, see ALJ Op. at 5-51.

2.    ALJ's Credibility Determinations

Wendy Schlosser, S.K.'s District speech-language therapist, testified for the District.  The ALJ found Schlosser's testimony to be credible and reliable.   Schlosser explained her understanding of S.K.'s needs and the program and methods that were required to address them cogently, thoroughly, and professionally.  She explained that a student's progress does not always involve a simple, straight-line progression from year to year.  Based upon her firsthand experience with S.K., Schlosser testified that he required continued work on the fundamental skills that he lacked and that were key to progressing in all areas of his education.  The ALJ found that Schlosser's testimony was corroborated by the reports of S.K.'s present levels of performance. Schlosser's efforts to discuss with Plaintiffs S.K.'s needs and her proposed amendments to his program are documented in the record.  (ALJ Op. 61.)

Jordan Marcus, S.K.'s case manager and the psychologist at S.K.'s middle school, also testified for the District.  The ALJ found Marcus's testimony to be credible and reliable.  The ALJ found that Marcus testified clearly, directly, and professionally and demonstrated a robust understanding of the complex issues presented when a child is qualified for special education and related services.  He demonstrated a thorough understanding of S.K.'s abilities and needs and a genuine desire for his success.  Marcus's explanation of the rationale for the District's approach to S.K.'s education was thorough and consistent.  (ALJ Op. 61.)

Lisa Vitale-Stanzione, whose primary responsibility is the District's reading program for general- and special-education students,[6] also testified for the District.  The ALJ found Vitale-

---

[6]     Vitale-Stanzione is also the District's supervisor of Special Education for kindergarten through fifth grade, and supervises the speech pathologist, the resource room and in-class-support classes, the general-education students who have IEPs, and some intervention classrooms for general-education students.  (ALJ Op. 29.)

Stanzione's testimony to be credible.  The ALJ also found that Vitale-Stanzione provided a detailed, logical, and thorough explanation of the District's program and how it was used to respond to S.K.'s needs and to help develop his executive-functioning and comprehension skills. Her explanation was based in research and directly addressed S.K.'s specific needs.  (ALJ Op. 61.)

The District also called witnesses Marjorie Murray, a learning disabilities teacher-consultant (LDTC) who serves on the child study team (CST) at Ridge High School, and Dr. Allyson Read, a District supervisor of Special Education who oversees the ABA program and speech-language services.  The ALJ found Murray's and Dr. Read's testimony to be credible.  Both of them clearly, directly, and professionally addressed the process utilized by the District in evaluating S.K. and identifying the appropriate programs for him.  Murray discussed her attempts to communicate with Plaintiffs and the desire she and other District personnel had to engage in an ongoing dialogue with them.  (ALJ Op. 61-62.)

S.K.'s mother, whom the ALJ referred to as "Ms. K," testified for Plaintiffs.  The ALJ found Ms. K.'s testimony to be credible, but noted the following:

> Ms. K. indicated, through her testimony, that she and her husband determined that the District's program was insufficient without having fully communicated with the staff and without a full understanding of the program.  Fundamentally, Ms. K.'s assessment of the curriculum was informed, in many instances, by her opinion. While she offered the caveat that she is not an educational professional and, thus, sought the counsel of experts, she determined that speech-language lessons were inappropriately fashioned; cooking in a social-skills class was unwarranted; the offered game-design elective was inappropriate for her son; and Unified Sports offered him no benefit.  She relied upon her personal assessments to support these and other similar conclusions about the impropriety of the curriculum and program.  Also, while it is undisputed that [Plaintiffs] were unable to initially meet with Schlosser, they did not follow up with her when they were available.  They did not communicate with Murray after the start of the school year, after vocational classes and math were addressed, or after Murray sent them a written statement of S.K.'s present levels of performance.

> They did not communicate with Flynn after they discussed integration of algebra into S.K.'s curriculum.  Further, Ms. K. could not discuss the Center School's curriculum.  However, she opined that it was beneficial for S.K. based upon his demeanor at home.  Finally, [Plaintiffs] did not request that the District convene an IEP meeting to discuss their evaluators' recommendations or ask that the IEP be modified.  Rather, they began their search for an out-of-district placement.

> [(ALJ Op. 62.)]

Plaintiffs also called Dr. Edna Barenbaum**,** Ph.D., an educational consultant who was qualified as an expert in psychology, educational programming for special-education students, and test construction.  As with S.K.'s mother, the ALJ noted concerns regarding the reliability of Dr. Barenbaum's opinions:

> However, I note that, while her testing produced a different total score than that indicated by the District's testing, she and the District agreed about the weaknesses that impacted S.K.'s learning.  Also, while she opined that the District did not utilize the methodologies that are necessary to address S.K.'s deficits and help him develop skills, it is apparent that she was not aware that the District did, in fact, use the very programs she recommended, and she testified that she did not know which program was used in his language class.  She did acknowledge that she observed executive-functioning strategies and scaffolding during S.K.'s in-District class.  She was unaware of the District's social-skills offerings and electives; did not know that the electives were with typical peers; did not observe S.K. at lunch; did not know if he participated in Unified Sports; and speculated about the Unified Sports program.  Her observation of one class was limited, and she did not return to the school to observe a math class because the drive to the school was too long.  Indeed, she testified that she relied upon [Plaintiffs]' reports of the District's programs and did not speak with District teachers or read about its programs.  Further, she did not know that the District's teachers were specially trained in special education and their substantive subject areas.

> Moreover, Dr. Barenbaum acknowledged, but seemed to dismiss, the fact that the Center School did not offer a social-skills class.  In contending that the test she administered was appropriate for S.K., notwithstanding that he was older than the recommended age range, she relied upon the assertions of an education professional who did

7

not testify.  The assertions are hearsay because there is no other admissible evidence of them.

[(ALJ Op. 62-63 (footnotes omitted).)]

Plaintiffs' last witness was Carly Fog, a speech-language pathologist who was admitted as an expert in speech and language pathology and education of students with speech and language disabilities.  The ALJ, once more, questioned the reliability of Carly Fog's testimony:

> However, [Fog] was unfamiliar with the District's programs that corresponded to her recommendations.  She was also unaware that, beginning in March 2021, the District's speech-language pathologist had tried to meet with [Plaintiffs] to revise S.K.'s goals and objectives and to discuss S.K.'s difficulties during remote instruction.  Fog was not given emails that recorded this and had only spoken with the pathologist for two to three minutes.

[(ALJ Op. 63-64.)]

For these reasons, the ALJ determined that she could not rely on the opinions of Plaintiffs' experts concerning the propriety of the District's program and placement for S.K.  (ALJ Op. 64.)

### 3. ALJ's Findings of Fact

The ALJ first made clear that "S.K.'s needs, expressive and receptive language and comprehension, are not in dispute."  (ALJ Op. 64.)

The ALJ found that "[t]he District, using accepted testing methods, and taking into consideration sub-test results and not only the composite score, identified the same weaknesses that were identified by [Plaintiffs]' experts."  (ALJ Op. 64.)  The ALJ determined that the District's program addressed S.K.'s needs "using appropriate methodologies, supports and modifications."  (ALJ Op. 64.)  The ALJ found that "the methodologies employed by District personnel were also recommended by Dr. Barenbaum."  (ALJ Op. 64.)

The ALJ also found that "S.K. made progress but required additional focus in many important areas, to achieve broad-based, generalized, success."  (ALJ Op. 64.)  The ALJ found

that Schlosser, "[u]sing her firsthand observations and knowledge of S.K.'s performance and needs, . . . reacted by developing revisions to his program, which she attempted to discuss with" Plaintiffs.  (ALJ Op. 65.)

The ALJ also found that the District "employed the methodologies recommended by Fog," and that "its witness credibly testified about S.K.'s small class size and the district's teacher-student ratio; the overarching goal of generalization of skills; and the teachers' thorough training." (ALJ Op. 65.)

The ALJ found that the District "provided opportunities for social-skills development," though Plaintiffs "did not enroll S.K. in Unified Sports, which would have offered additional social-skills opportunities, and S.K. did not continue with the social-skills club."  (ALJ Op. 65.)

As to the impact of COVID-19 pandemic closures, the ALJ stated,

> The record demonstrates that S.K. was adversely impacted, to some extent, by remote instruction.  The credible evidence in the record also indicates that, when he returned to in-person instruction, his lack of attention and impulsivity impacted every aspect of his functioning. Staff addressed his needs in this regard and also prepared to amend his IEP accordingly.  Staff reported that he began to make progress after he returned to school.
>
> [(ALJ Op. 66.)]

The ALJ found that the District responded to parent concerns — for example, when the parents requested that S.K. learn more algebra, his teacher provided more algebraic work.  (ALJ Op. 66.)

The ALJ found that "[a]s all of the testing consistently showed that S.K. tested below average in language and cognition and, as reported by Schlosser, he was in the lower to mid-range of the students in his class, the District properly placed S.K. in a class with students who were at his level."  (ALJ Op. 66.)

4.      ALJ's Conclusions of Law

The ALJ concluded that the District "crafted a program and provided a placement for S.K. that was reasonably calculated at that time to provide him with significant learning and meaningful educational benefit in light of his individual needs and potential, and the District's IEP offered this in the least restrictive environment."  (ALJ Op. 73-74.)  The ALJ further concluded that because "the District provided [Plaintiffs] a FAPE under the IDEA," Plaintiffs are "not entitled to the relief they seek—placement at the Center School, reimbursement for the cost of enrollment at the school, and compensatory relief."  (ALJ Op. 74.)

**D.      District Court Proceedings**

Following the ALJ's decision, Plaintiffs filed suit in this Court.  (ECF No. 1.)  Plaintiffs assert one cause of action: "Defendant failed to meet its burden of proving S.K. was offered FAPE and therefore the A.L.J.'s Decision should be reversed."  (ECF No. 1 at 11.)  Because the parties did not intend to bring new evidence before the Court, the parties moved for summary judgment. (ECF Nos. 12, 13.)

## II.    LEGAL STANDARDS

"Where no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record."  *K.H. ex rel. B.Y. v. N. Hunterdon-Voorhees Reg'l High Sch.*, Civ. No. 05-4925, 2006 WL 2331106, at *4 (D.N.J. Aug. 10, 2006) (citing *G.A. ex rel. M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003)).  "The standard of review under which this Court considers an appeal of a state administrative decision under the IDEA differs from that governing the typical review of summary judgment."  *M.A.*, 202 F. Supp. 2d at 359 (citation and internal quotation marks omitted).  The parties' motions, though

framed as ones for summary judgment, are truly appeals of the ALJ's ruling. *G.S. v. Cranbury Twp. Bd. of Educ.*, Civ. No. 10-774, 2011 WL 1584321, at *8 (D.N.J. Apr. 26, 2011), *aff'd*, 450 F. App'x 197 (3d Cir. 2011); *M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 (D.N.J. 2007), *aff'd*, 263 F. App'x 264 (3d Cir. 2008).

"When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). "Factual findings from the administrative proceedings are to be considered prima facie correct,' and if the reviewing court does not adhere to those findings, it is obliged to explain why." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (citation and internal quotation marks omitted). "Moreover, the reviewing court must accept the ALJ's credibility determinations and 'may disturb them only upon a finding that non-testimonial extrinsic evidence justifies a contrary conclusion.'" *E.P. v. N. Arlington Bd. of Educ.*, Civ. No. 17-08195, 2019 WL 1495692, at *4 (D.N.J. Apr. 1, 2019) (quoting *C.S. v. Montclair Bd. of Educ.*, Civ. No. 16-3294, 2017 WL 4122433, at *4 (D.N.J. Sept. 18, 2017)). An ALJ's legal determinations, on the other hand, are reviewed de novo. *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011). "Applying these standards, the district court may make findings "based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education." *Id.* (quoting *Bayonne*, 602 F.3d at 564).

## III.   <u>DISCUSSION</u>

Plaintiffs seek an order reversing the ALJ's conclusions that (1) the District provided S.K. a free appropriate public education and (2) Plaintiffs did not show that they had made an

appropriate educational placement at the Center School.  (ECF No. 12 ¶ 1.)  Plaintiffs argue that

the ALJ erred in the following ways:

- the ALJ found that the District met its burden of proving that it offered a FAPE;

- the ALJ failed to give appropriate weight to the substantial evidence on the record supporting stagnation and regression and failed to consider that the testimony and records revealed that S.K. did not make significant and meaningful academic progress;

- the ALJ ignored or gave too little weight to the data showing that the LLD program failed to permit S.K. to achieve the goals set out for him in the District's IEPs;

- the ALJ ignored or gave too little weight to the validity and accuracy of the District's progress reports and IEPs;

- the ALJ ignored or gave too little weight to the appropriateness of the curriculum S.K. was offered despite his cognitive ability and the inappropriate instruction despite his severe language disability;

- the ALJ ignored or gave too little weight to the lack of accommodations and modifications provided to S.K. in the mainstream environment;

- the ALJ ignored or gave too little weight to the lack of appropriate peer reciprocity in the classroom and in extracurricular or after-school activities;

- the ALJ ignored or gave too little weight to the testimony of multiple experts and reports identifying SK's severe language needs and his need for an intensive, multisensory, carefully calibrated program;

- the ALJ gave too much weight to the testimony of the District's witnesses, which completely ignored the District's own objective data;

- the ALJ incorrectly relied on programs that the District witnesses testified that they could have offered, and faulted the parents for not trying programs purportedly available but never actually offered; and

- the ALJ found that Plaintiffs did not meet the factors necessary to entitle them to compensation for the unilateral placement of their son at the Center School.

[(ECF No. 12 ¶ 2.)]

The Court addresses these asserted errors as they appear in Plaintiffs' motion papers.

### A.      Free Appropriate Public Education (FAPE)

Under the IDEA, school districts must work with parents to design an IEP. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)).  An "IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414(d)(1)(A)).  "Although the IEP must provide the student with a 'basic floor of opportunity,' it does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents." *Ridley*, 680 F.3d at 269 (quoting *Bayonne*, 602 F.3d at 557).  Rather, an IEP must, at a minimum, "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *Id.* (internal citations and quotation marks omitted); *see K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (noting the "longstanding formulation" described in *Ridley*); *see also N. Arlington*, 2019 WL 1495692, at *4 ("[T]he IDEA 'requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" (quoting *Endrew F.*, 580 U.S. at 403)).

Plaintiffs argue that the ALJ erred in finding that the School District sufficiently proved that it offered S.K. a FAPE.  (ECF No. 12-1 at 11.)  They submit four reasons in support: *first*, the ALJ's decision "is against the weight of the objective evidence and inconsistent with state and federal special education laws"; *second*, in finding that S.K.'s program was differentiated to meet his individual needs," the ALJ "failed to consider substantial testimony pertaining to the appropriateness of S.K.'s curriculum"; *third*, the ALJ should not have "considered programs that the District could have offered to S.K. but did not"; and *fourth*, the ALJ should not have considered

testimony about the impact of the COVID-19 pandemic.  (*See generally* ECF No. 12-1 (cleaned up).)  The Court addresses each reason in turn.

1.    Objective Evidence and Special Education Laws

The ALJ's decision is not "against the weight of the objective evidence" or "inconsistent with state and federal special education laws," as Plaintiffs contend.  (ECF No. 12-1 at 13 (capitalizations altered).)  Plaintiffs point to no objective data that the ALJ overlooked.  What Plaintiffs call "objective data" are truly their experts' data-interpretation.  As the Court will discuss, Plaintiffs appear only to disagree with the ALJ's decision to credit the District's experts' interpretations.

To start, Plaintiffs assert that the ALJ, in finding that S.K. had made progress, relied on testimony of the District's witnesses despite years of IEPs and progress reports demonstrating that S.K.'s progress was stagnant or regressed.  (ECF No. 12-1 at 13-25.)  Plaintiffs say that (1) documentary evidence indicates that S.K. had mastered only one goal and (2) the IEPs repeat several goals and objectives from year to year.  (*Id.*)  Additionally, Plaintiffs assert that the District's IEPs and progress reports did not match its own data.  (*Id.* at 24-25.)  For example, one document indicates that S.K. mastered an objective, yet another document reports that S.K. can perform that same skill with only 50% accuracy.  (*Id.*)[7]

The Court disagrees with Plaintiffs' assertion that this evidence supports a finding contrary to the ALJ's.  "[T]he mere fact that a student's IEP goals are continued does not necessarily mean that the similar IEPs were not reasonably calculated to confer educational benefit."  *James D. v. Bd. of Educ. of Aptakisic-Tripp Cmty. Consol. Sch. Dist. No. 102*, 642 F. Supp. 2d 804, 827 (N.D.

---

[7]    For other examples of achievement–reporting inconsistencies, see the ALJ's opinion at ECF No. 16-19 at 11-12.

Ill. 2009) (citing *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 534 (3d Cir. 1995)); *c.f. Damarcus S. v. D.C.*, 190 F. Supp. 3d 35, 53 n.7 (D.D.C. 2016) (admonishing that a "wholesale, cut-and-paste repetition is symptomatic of a larger, more concerning failure by the District to adapt its approach in the face of [the plaintiff's] continued frustration and lack of progress").

On this point, the ALJ recounted the District witnesses' reasons for the repeated goals and objectives. Murray explained that "S.K.'s ongoing challenges necessitated that he continue to work on these goals and objectives," and that the District would not "omit [a goal or objective] from the document if it still needs to be addressed." (ALJ Op. 12-13 (quoting 1Tr. 111:7-8, 119:23-120:7).) Murray also testified that "[i]t was not unusual for a student's goals to be repeated from one IEP to another, as they were for S.K.," especially considering the impact of the COVID-19 pandemic closures on class instruction and S.K.'s transition from middle school to high school. (ALJ Op. 13.)

Likewise, Marcus testified that "[s]ome goals and objectives were carried over from the prior IEP (2019-2020 school year) because it had been developed late in the school year due to S.K. having recently moved to the school district," and that "S.K. had made progress in a number of areas, but some had not been achieved and were still being addressed." (ALJ Op. 22.) Marcus also explained that "[c]ontinuation of the objectives in the next IEP was intended to reinforce the skills." (ALJ Op. 25.)

As to achievement–reporting inconsistencies, Schlosser testified that "for students with autism, like S.K., inconsistencies are inherent." (ALJ Op. 19.) Schlosser added that "[a]lthough [S.K.] may have mastered a goal at one time, he did not necessarily generalize the skill." (ALJ Op. 19.) "Schlosser distinguished mastery, which demonstrated when a student meets a goal's

criteria over two sessions, from generalization, when a student consistently and independently demonstrates the act or function in a variety of settings."  (ALJ Op. 19.)

Contrary to Plaintiffs' assertion, the ALJ did not "ignore" that S.K. continued receiving instruction in concepts that he had already worked on.  (ECF No. 12-1 at 30 (citing 5Tr. 99:23-100:15).)  In fact, the ALJ found that "[a]lthough several goals and objectives were repeated in S.K.'s IEP, . . . he was learning and progressing," but "there remained room for further progress, and he still needed to generalize his skills in many areas."  (ALJ Op. 73.)  And the ALJ credited Schlosser's testimony in finding that Schlosser had "documented S.K.'s inconsistency, which was routine among students with autism."  (ALJ Op. 65.)  The ALJ's decision to credit the District witnesses' testimony is thorough and well-reasoned.

### 2.    Program Differentiation & Curriculum Appropriateness

Plaintiffs next challenge the ALJ's finding in favor of the District that "S.K.'s class programs were differentiated to meet his individual needs and abilities and his visual skill strength was utilized to help him develop skills across other educational areas."  (ALJ Op. 64.)  Plaintiffs argue that in so finding, the ALJ "failed to consider substantial testimony pertaining to the appropriateness of S.K.'s curriculum."  (ECF No. 12-1 at 25-37 (capitalizations altered).)  But as discussed below, none of Plaintiffs' supporting points warrants reversal of the ALJ's findings.

Plaintiffs contend that the ALJ over-credited Murray's opinion that nonverbal assessments should not be administered to verbal students — an opinion that Plaintiffs say is incorrect, beyond Murray's expertise as a learning consultant, and at odds with the testimony of Marcus, the District's psychologist.[8]  (*Id.* at 27.)

---

[8]    Dr. Barenbaum "tested S.K.'s nonverbal ability to learn what he was capable of outside the realm of verbal skills," believing that such a "language free intelligence test" would "minimize bias created by [S.K.'s] severe language/learning disability."  (ALJ Op. 34; P-1 at 11.)

Plaintiffs overstate the significance of Murray's testimony.  Nothing in the record suggests that the ALJ gave special weight to Murray's testimony about administering a nonverbal test such that her testimony especially influenced the ALJ's decision.  Indeed, Murray was not the only District witness to disagree with administering a nonverbal test to S.K.  She was joined by Schlosser, S.K.'s District speech-language therapist who has a master's degree in education and speech pathology communication services and a certificate of clinical competence in speech-language, and Marcus, the middle-school psychologist.  (*See* ALJ Op. 18 ("Schlosser disagreed with Dr. Barenbaum's use of non-verbal testing to evaluate S.K. because S.K. is verbal."), 22 ("Marcus reviewed Dr. Barenbaum's report and questioned her use of a non-verbal assessment because S.K. is not non-verbal, even though he has expressive and attention deficits.").)  Plaintiffs do not contest Schlosser's or Marcus's qualification to render that opinion.  So even if Murray is not qualified to opine on the appropriateness of administering a nonverbal assessment to S.K., her opinion was corroborated by witnesses who are so qualified.

Plaintiffs also claim that the ALJ "ignored" Marcus's testimony "confirming that when the verbal aspect of testing is removed, S.K.'s score is significantly higher."  (ECF No. 12-1 at 27.)  The Court disagrees.  The ALJ recounted that Marcus testified to the "significant difference between [S.K.'s] verbal and visual-spatial scores," the latter being "significantly higher."  (ALJ Op. 23; ECF No. 12-1 at 27.)  But that piece of "objective data," as Plaintiffs describe it, is not in dispute.  Rather, the parties disagree over the significance of that higher visual-spatial score.  On the one hand, Plaintiffs believe that the higher visual-spatial score means that "S.K.'s cognitive function is at an average level," and so "he should interact with students at that level."  (ALJ Op. 18.)  The District, on the other hand, believes that the nonverbal assessment "offered a very narrow view of S.K. and was not a complete review of his strengths and weaknesses"; that the District

appropriately assessed "functional information derived from observations, S.K.'s teachers, and his parents, as well as test results" and "each of the individual scales and sub-test scores"; and that "all other testing reported that S.K. tested below average in language and cognition and he was in the lower to mid-range of the students in the class." (ALJ Op. at 18, 21-24.)  Because neither of these competing opinions conflicts with objective data, the ALJ's decision to credit either must not be disturbed, and the ALJ's related findings are prima facie correct. *See Bayonne*, 602 F.3d at 564.

The ALJ ultimately agreed with the District.  It concluded that the District "demonstrated, by a preponderance of the credible evidence, that it used appropriate testing to evaluate S.K. and identify his strengths and weaknesses." (ALJ Op. 73.)  That legal ruling does not conflict with the subject non-testimonial extrinsic evidence — that is, S.K.'s higher visual-spatial score on a nonverbal test, which Plaintiffs describe as objective data.  Rather, the ruling resolves the issue whether the District acted on that data appropriately.  That the ALJ, in resolving that issue, did not adopt Dr. Barenbaum's opinions does not mean that the ALJ did not consider them, as Plaintiffs assert. (*See* ECF No. 12-1 at 27.)  In fact, the WISC-V instruction on which Dr. Barenbaum relied — and which Plaintiffs say the ALJ "did not take . . . into consideration while rendering her opinion" — appears verbatim in the ALJ's opinion. (*Id.* at 28; ALJ Op. 34.)  The ALJ's decision to reject Dr. Barenbaum's opinions was a credibility determination that the Court must accept absent "a finding that non-testimonial extrinsic evidence justifies a contrary conclusion." *N. Arlington*, 2019 WL 1495692, at *4.  The Court makes no such finding here.

Plaintiffs also assert that given S.K.'s "average intelligence," his program for transitioning to high school should not have focused on functional skills with an emphasis on vocational and life skills. (ECF No. 12-1 at 28-29; ALJ Op. 34.)  Instead, Dr. Barenbaum opined, S.K. needs a

program that will develop his social skills in an environment that requires him to work with other people. (3Tr. 66:6-18.) For her part, Dr. Barenbaum administered S.K. the Vineland-3 assessment to measure how S.K. functions in everyday life and navigates in the home and community. (P-1 at 15, ECF No. 16-5 at 15.) From that assessment, Dr. Barenbaum determined that S.K. is "totally independent" and "doesn't need those life skills." (3Tr. 65:22-23 (Barenbaum); ECF No. 12-1 at 29.) Plaintiffs thus submit that placing "a student who is functioning in the average range of intelligence with average daily living skills in adaptive behavior in classroom with a life skills and work study focus" is inappropriate. (ECF No. 12-1 at 30.)

But the ALJ did not need to credit Dr. Barenbaum's determinations. And contrary to Plaintiffs' assertion, the ALJ did not "disregard" that the District's program for S.K. focused on life skills "despite the objective data," i.e., Dr. Barenbaum's takeaways from the Vineland-3 assessment indicating that S.K.'s "life skills such as telling time was a strength." (*Id.*) The ALJ recounted Dr. Barenbaum's testimony and "evaluative findings" thoroughly. (*See* ALJ Op. 40.) In fact, the ALJ found that although Dr. Barenbaum's and the District's testing yielded different total scores, both agreed about the weaknesses that impacted S.K.'s learning. (ALJ Op. 62; *see also* ALJ Op. 64 ("S.K.'s needs, expressive and receptive language and comprehension, are not in dispute.").) The issue then is, again, whether the District acted on that data appropriately.

The ALJ ruled that the District had. In so ruling, the ALJ detailed why Dr. Barenbaum's opinions deserved skepticism. For example, the ALJ heeded what Dr. Barenbaum had not considered: Dr. Barenbaum "was unaware of the District's social-skills offerings and electives; did not know that the electives were with typical peers; did not observe S.K. at lunch; did not know if he participated in Unified Sports; and speculated about the Unified Sports program." (ALJ Op. 39, 44, 63; 3Tr. 97:15-100:19.) The ALJ noted that when Dr. Barenbaum wrote her observation

report, the Center School did not have a social-skills club. (ALJ Op. 45, 63; 3Tr. 59:10-14, 109:18-110:6.) The ALJ also noted that Dr. Barenbaum relied on an assessment that is standardized for students younger than S.K. (ALJ Op. 36, 63; 3Tr. 14:4-13, 47:7-18.) And the ALJ noted that Dr. Barenbaum was apparently "not aware that the District did, in fact, use the very programs she recommended." (ALJ Op. 62-63.) As the findings underlying the ALJ's credibility determinations do not conflict with non-testimonial extrinsic evidence, the determinations must not be disturbed.

Plaintiffs also challenge the ALJ's findings as to the District's handling of S.K.'s placement in elective classes. (ECF No. 12-1 at 31-32.) Plaintiffs assert that when S.K. struggled in the word processing elective, the District "never offered a modified curriculum, nor was one ever suggested," even though S.K.'s IEP provides for guided instruction, which contemplates a modified curriculum. (*Id.*) In support, Plaintiffs cite only S.K.'s mother's testimony that she did not "recall any kind of major conversation about accommodations." (*Id.* at 32 (citing 4Tr. 38:5-12).) Yet Plaintiffs provide no reason why that testimonial evidence highlights a conflict between the ALJ's finding and nontestimonial extrinsic evidence. For that reason alone, the Court will not disturb the ALJ's credibility determination.

But in addition, the ALJ's determination aligns with record evidence. An email shows that Murray had asked Plaintiffs if they were open to making S.K.'s electives pass-fail grading so that "the teacher can make the modifications for [S.K.] and not feel that pressure to grade him according to the grading criteria." (ECF No. 16-3 at 272; *see* 1Tr. 142:10-143:15.) At trial, when Murray was asked why S.K.'s curriculum could not be modified without converting his grading to pass-fail, Murray explained that to modify the curriculum of a "weighted class" whose grade factors into a student's GPA, the student must have a "modified grading criteria." Because S.K.'s IEP did not have a modified grading criteria, modifying the curriculum could instead be done with pass-

fail grading.  (1Tr. 143:10-144:17.)  Plaintiffs have not cited any authority or record evidence supporting their counterargument that "[t]here is no requirement the class must be pass/fail" for S.K. to participate.  (ECF No. 12-1 at 32.)  The ALJ was therefore entitled to credit Murray's reasonable explanation for the proposed pass-fail grading.

### 3.    Program Actually Offered

The ALJ considered IEPs that the District offered, not ones the District could have offered.

The "adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993).  "[I]n determining whether an IEP was appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had been so inclined." *Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist.*, 560 A.2d 1180, 1189 (N.J. 1989).

To show that the ALJ considered only programs that the District could have offered but did not, Plaintiffs cite three excerpts from the ALJ's opinion.  (ECF No. 12-1 at 37-38.)  First, summarizing Murray's testimony, the ALJ noted that "[w]hen asked if S.K. could have been given an alternate curriculum or alternate goals and objectives for the class, Murray replied that this could have been done in conjunction with pass-fail grading."  (ALJ Op. 14.)  Second, assessing Dr. Barenbaum's credibility, the ALJ noted that "she relied upon [Plaintiffs]' reports of the District's programs and did not speak with District teachers or read about its programs."  (ALJ Op. 63.)  Third, assessing Fog's credibility, the ALJ noted that "she was unfamiliar with the District's programs that corresponded to her recommendations."  (ALJ Op. 63.)

None of these excerpts warrant a reversal of the ALJ's findings.

21

For starters, the excerpt from Murray's testimony is merely part of the ALJ's summary of testimony. At the outset of that section, the ALJ makes clear that "it is a summary of the testimony and evidence that I found helpful to resolving the issues presented in this matter." (ALJ Op. 4.) The ALJ did not tie any finding of fact to Murray's testimony on this point.

Besides, Murray testified that the word-processing teacher could modify S.K.'s curriculum as his IEP provided for guided instruction, including a modified curriculum. (1Tr. 144:21-146:13.) The exact curriculum was not required to be in the IEP. *See W.R. v. Union Beach Bd. of Educ.*, Civ. No. 09-2268, 2010 WL 1644138, at *11 (D.N.J. Apr. 22, 2010), *aff'd*, 414 F. App'x 499 (3d Cir. 2011) (rejecting that an IEP must include a specific program or methodology). And still, that an ALJ recognizes that "IEPs may be changed in the future depending on [the student's] evolving needs does not mean that the ALJ failed to determine whether [an] IEP at that time provided [the student] with a FAPE." *K.G. v. Cinnaminson Twp. Bd. of Educ.*, Civ. No. 17-04740, 2018 WL 4489672, at *7 (D.N.J. Sept. 19, 2018). Regardless, the ALJ concluded that the District's actual IEP provided S.K. with a FAPE.

The second and third excerpts concern the ALJ's credibility determinations and thus enjoy deference. In assessing credibility, the ALJ considered, among other things, the witnesses' "ability to know and recall relevant facts and information." (ALJ Op. 61.) As to Dr. Barenbaum and Fog, the ALJ noted the relevant information they did not know or consider. The Court defers to the ALJ's determinations.

### 4. Impact of COVID-19 Pandemic

"[E]ven in times of emergency, the IDEA itself requires school districts to provide FAPEs to students with IEPs." *Abigail v. Old Forge Sch. Dist.*, Civ. No. 21-02033, 2023 WL 2505011, at *9 (M.D. Pa. Mar. 14, 2023).

Plaintiffs do not assert that the COVID-19 pandemic impacted S.K.'s IEP.   Indeed, Plaintiffs submit that "even during the 6-month school closure, S.K. was not immensely impacted by the Covid-19 Pandemic." (ECF No. 12-1 at 40.)  Plaintiffs suggest, rather, that the ALJ excused the District from providing S.K. with a FAPE due to COVID-19 pandemic closures.  (*Id.* at 39-41.)  The Court disagrees.  For Plaintiffs to be correct, the Court must find that the District did not provide a FAPE.  But as discussed above, the Court sees no reason to disturb the ALJ's findings of fact and conclusions of law that the District provided S.K. with a FAPE.

### B.  Appropriateness of the Center School

"Parents may unilaterally place their child at a different school, but are eligible for reimbursement from the school district if, and only if, the school district has not offered the student a FAPE." *J. F. v. Byram Twp. Bd. of Educ.*, 812 F. App'x 79, 81 (3d Cir. 2020) (citing *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004)); N.J. Admin. Code § 6A:14-2.10(d).  Thus, when parents seek reimbursement for a unilateral placement, the first inquiry is whether the school district offered a FAPE.  *Shore Reg'l*, 381 F.3d at 198-99.  The school district must show that "it complied with the procedures set out in the IDEA and that the IEP was 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the child's 'intellectual potential.'"  *Id.* at 199 (citing *Rowley*, 458 U.S. at 206-07).  If the school district offered a FAPE, then "no reimbursement is required."  *Id.* at 198 (citing N.J. Admin. Code 6A14-2.10(a)).

Plaintiffs argue that "a student may be entitled to reimbursement for a unilateral placement if the court concludes both that the public placement violated IDEA and that the private school placement was proper under the IDEA."  (ECF No. 12-1 at 42 (citing *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7 (1993)).)  Because the Court will not disturb the

ALJ's decision that the District provided a FAPE, it need not consider the appropriateness of S.K.'s placement in the Center School.

**IV.**     <u>**CONCLUSION**</u>

For the reasons set forth above, and other good cause shown, Plaintiffs' motion for summary judgment (ECF No. 12) is **DENIED** and the District's motion for summary judgment (ECF No. 13) is **GRANTED**.  An appropriate Order follows.


Dated: February 28, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE